# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-21-00308-CV

---

**Bart Debrock, Appellant**

**v.**

**Marlies Debrock, Appellee**

---

### FROM THE 155TH DISTRICT COURT OF FAYETTE COUNTY
### NO. 2018V-036, THE HONORABLE JEFF R. STEINHAUSER, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Bart Debrock appeals from the trial court's final decree of divorce. On appeal, Bart presents five issues.[1] For the reasons stated below, we affirm.

## BACKGROUND

Bart and appellee Marlies Debrock were married on December 29, 1998. The parties have three children, two of whom had turned eighteen years old and one of whom had graduated from high school by the time the divorce decree was entered.[2] In the decree, Marlies was named the conservator with the right to designate the minor child's residence. Bart does not challenge any of the child-custody or child-support orders.

---

[1] Because the parties share the same last name, for clarity, we refer to them by their first names.

[2] The decree, which was signed on May 6, 2021, states that the parties' middle child was over the age of eighteen years at that time and was expected to graduate from high school in May 2021.

At the time of the divorce proceedings, the couple owned two companies, Belgian Antiques, LLC and Lion's Antiques, LLC, that Bart operates. Bart buys antiques from estates in Belgium and France and ships them to the United States to sell. He also sometimes buys antiques at auctions in the United States. He testified that he sells antiques to wholesalers at the biannual antique show in Warrenton and out of his warehouses. He also ships products from Europe for unrelated parties. Marlies did not work outside the home at all during the marriage, other than for a few months in 2010 when she was separated from Bart and living with her parents. The evidence at trial reflected that Bart controlled the parties' finances throughout the marriage.

Marlies filed a petition for divorce in February 2018. During the three years that the divorce was pending, the trial court heard numerous motions to compel, motions for enforcement of temporary orders, and motions for sanctions. The trial court began a seven-day bench trial in January 2021. It granted the divorce on the grounds of insupportability and cruel treatment by Bart. The court found that Marlies should receive a disproportionate division of the community estate. In addition, it ordered that Bart pay Marlies spousal maintenance in the amount of $3,500 per month for a period of seven years.

**ANALYSIS**

On appeal, Bart challenges the decree in five issues. After considering the arguments raised in his first issue asserting that the trial court erred by awarding spousal maintenance, we will turn to his remaining four issues, which are all related to alleged errors in the trial court's findings regarding the property valuation and characterization and its division of the property.

## I. Spousal-Maintenance Award

Bart challenges the trial court's spousal-maintenance award ordering him to pay Marlies $3,500 per month for seven years. Although Bart's counsel acknowledged at trial that Marlies would need some time to transition into the workforce, and Bart had proposed before trial that Marlies receive two years of spousal maintenance at $1,300 per month, on appeal Bart asserts that the trial court abused its discretion by ordering *any* spousal maintenance because (1) Marlies did not seek employment or any additional education during the pendency of this divorce, and she did not establish that an exception to the presumption against spousal maintenance applies; (2) she did not establish that $3,500 per month is the amount necessary for her minimum reasonable needs; and (3) the amount awarded exceeds the amount statutorily allowed.

We review a trial court's award of spousal maintenance for an abuse of discretion. *Kelly v. Kelly*, 634 S.W.3d 335, 364 (Tex. App.—Houston [1st Dist.] 2021, no pet.). Thus, we will not disturb an order awarding spousal maintenance unless the trial court acts arbitrarily, unreasonably, without regard to guiding rules and principles, or without supporting evidence. *See Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998); *In re Fuentes*, 506 S.W.3d 586, 593 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding). When considering whether the trial court abused its discretion, "legal and factual sufficiency of the evidence are not independent grounds for asserting error, but they are relevant factors" in our assessment. *Dunn v. Dunn*, 177 S.W.3d 393, 396 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *see also Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied). There is no abuse of discretion as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Stamper v. Knox*, 254 S.W.3d 537, 542 (Tex. App.—Houston [1st Dist.] 2008, no pet.).

3

Courts apply a hybrid analysis because of the overlap between the abuse-of-discretion and sufficiency-of-the-evidence standards of review, engaging in a two-pronged inquiry to determine whether the trial court (1) had sufficient information on which to exercise its discretion and (2) erred in its application of that discretion. *Zeifman*, 212 S.W.3d at 588.

We conduct a traditional sufficiency review to answer the first question, applying the familiar standards for determining the legal and factual sufficiency of the evidence. Marlies bore the burden of proof on her spousal-maintenance claim. *See, e.g.*, *Peck v. Peck*, No. 03-14-00440-CV, 2016 WL 3917131, at *3 n.16 (Tex. App.—Austin July 15, 2016, no pet.) (mem. op.) (citing *e.g.*, *Cooper v. Cooper*, 176 S.W.3d 62, 65 (Tex. App.—Houston [1st Dist.] 2004, no pet.)). Consequently, to attack the legal sufficiency of the evidence supporting the trial court's findings on Marlies's spousal-maintenance claim, Bart must demonstrate on appeal that there is no evidence to support the adverse findings. *See Zeifman*, 212 S.W.3d at 588 (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983)). We analyze whether the evidence would enable reasonable people to reach the judgment being reviewed, crediting evidence favorable to the findings if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *Id.* (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We consider the evidence in the light most favorable to the findings and indulge every reasonable inference that would support them. *City of Keller*, 168 S.W.3d at 822. When analyzing the factual sufficiency of the evidence supporting the trial court's findings on Marlies's spousal-maintenance claim, we must consider and weigh all of the evidence pertinent to the findings to determine whether the credible evidence supporting them is so weak, or so contrary to the overwhelming weight of the evidence, that the findings should be set aside because they are clearly wrong and manifestly

4

unjust. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Under either sufficiency standard, we defer to the reasonable credibility determinations made by the factfinder (here, the trial court) and do not merely substitute our judgment. *See City of Keller*, 168 S.W.3d at 816-17, 819-20, 822 (legal sufficiency); *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (factual sufficiency). The factfinder "is the sole judge of the credibility of witnesses and the weight to be given to their testimony." *Golden Eagle Archery*, 116 S.W.3d at 761. If we conclude in answer to the first question that the trial court had sufficient information upon which to exercise its discretion, to answer the second question, we determine whether the trial court made a reasonable decision based on the evidence, "that is, that the court's decision was neither arbitrary nor unreasonable." *Zeifman*, 212 S.W.3d at 588.

## A.      Legal framework

Family Code Chapter 8 governs the award of spousal maintenance in a divorce decree. *See* Tex. Fam. Code §§ 8.001-.359; *Dalton v. Dalton*, 551 S.W.3d 126, 130 (Tex. 2018) ("In 1995, the Texas Legislature first authorized courts to award a form of involuntary post-divorce alimony referred to as 'spousal maintenance.'"). The Family Code defines "maintenance" as "an award in a suit for dissolution of a marriage of periodic payments from the future income of one spouse for the support of the other spouse." Tex. Fam. Code § 8.001(1). "The legislative purpose in enacting provisions for spousal maintenance was to provide temporary and rehabilitative support for a spouse whose ability for self-support is lacking or has deteriorated over time while

5

engaged in homemaking activities and whose capital assets are insufficient to provide support." *O'Carolan v. Hopper* (*O'Carolan I*), 71 S.W.3d 529, 533 (Tex. App.—Austin 2002, no pet.).

The Family Code authorizes trial courts to award spousal maintenance in "very limited circumstances" if the parties meet certain eligibility requirements. *Dalton*, 551 S.W.3d at 130 (quoting *McCollough v. McCollough*, 212 S.W.3d 638, 645 (Tex. App.—Austin 2006, no pet.)); *see also* Tex. Fam. Code § 8.051. In this case, Marlies sought maintenance under Section 8.051(2), which provides in relevant part:

> [T]he court may order maintenance for either spouse only if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs and
>
> . . . .
>
> > (2) the spouse seeking maintenance:
> >
> > > (A)  is unable to earn sufficient income to provide for the spouse's minimum reasonable needs because of an incapacitating physical or mental disability; [or]
> > >
> > > (B)  has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs . . . .

Tex. Fam. Code § 8.051.

If the trial court determines that a spouse is eligible to receive maintenance, the court "shall determine the nature, amount, duration, and manner of periodic payments by considering all relevant factors." Tex. Fam. Code § 8.052. Section 8.052 provides a nonexclusive list of eleven factors to consider, including "each spouse's ability to provide for that spouse's minimum reasonable needs independently, considering that spouse's financial resources on

6

dissolution of the marriage"; "the age, employment history, earning ability, and physical and emotional condition of the spouse seeking maintenance"; "acts by either spouse resulting in excessive or abnormal expenditures or destruction, concealment, or fraudulent disposition of community property, joint tenancy, or other property held in common"; and "the contribution of a spouse as homemaker." *Id.* § 8.052(1), (4), (6), (9). The Family Code also limits the duration and amount of maintenance payments, *id.* §§ 8.054 (duration), .055 (amount), and it requires the obligation to automatically terminate upon the occurrence of certain events, *id.* § 8.056.

A person who establishes their eligibility for maintenance under Section 8.051(2)(B) must also overcome Section 8.053's rebuttable presumption against maintenance:

a) It is a rebuttable presumption that maintenance under Section 8.051(2)(B) is not warranted unless the spouse seeking maintenance has exercised diligence in:

(1) earning sufficient income to provide for the spouse's minimum reasonable needs; or

(2) developing the necessary skills to provide for the spouse's minimum reasonable needs during a period of separation and during the time the suit for dissolution of the marriage is pending.

*Id.* § 8.053.

## B.     Relevant Facts

In her divorce petition, Marlies sought an award of post-divorce spousal maintenance. At trial, Marlies testified about her employment history and her mental-health history. In the divorce decree, the trial court found that Marlies is eligible for spousal maintenance under the provisions of Texas Family Code Chapter 8, and it ordered Bart to pay $3,500 per month

7

to Marlies for seven years.[3]  The trial court made the following findings of fact and conclusions of

law that are relevant to the issue of spousal maintenance:[4]

> 14.  **Disparity of Earnings**.  The Court finds that Bart's annual earning capacity
> is in excess of $150,000.00 per year and that the earning capacity of Marlies is less
> than $18,000.00 per year; that the amount of net income reported by Bart on the
> parties' income tax returns is not representative of his earning capacity and
> misreports said income.  [Finding of Fact]
>
> . . . .
>
> 20.  **Spousal Maintenance.**  The Court has considered all of the factors listed in
> Texas Family Code Sec. 8.052.  The Court finds that Marlies never earned a degree
> past a high school GED, never worked outside the home (except for a few months),
> never made substantial earnings during the marriage, was a full time stay at home
> mother and wife during the pendency of the marriage, that Bart was in control of
> virtually all aspects of the marriage to the detriment of Marlies (personally and
> financially), that Marlies contributed as a homemaker in the marriage, that Bart has
> increased earning power having been awarded the parties' only income (the
> businesses) in the marriage, and that Marlies has met her burden under the Texas
> Family Code to be awarded spousal maintenance.  The Court finds that Marlies has
> been married to Bart for more than 20 years and lacks the ability to earn sufficient
> income to provide for Marlies' minimum reasonable needs and lacks sufficient
> property, including separate property, to provide for Marlies' minimum reasonable
> needs.  Due to the length of marriage and the factors considered in this case by the
> Court, the Court awarded Marlies the sum of $3,500.00 per month in spousal
> maintenance for a period of 7 years.  Due to Bart's lack of veracity and lack of

---

[3]  Section 8.054 establishes that a trial court may order maintenance that remains in effect
for up to "seven years after the date of the order, if the spouses were married to each other for at
least 20 years but not more than 30 years." Tex. Fam. Code § 8.054(a)(1)(B).  It is undisputed that
the parties were married to each other for more than twenty years, and the trial court made a finding
of fact to that effect.

[4]  Findings of fact in a case tried to the court have the same force and dignity as a jury's
verdict.  *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991).  We defer to
unchallenged findings of fact that are supported by some evidence.  *Tenaska Energy, Inc.
v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014) (citing *McGalliard v.
Kuhlmann*, 722 S.W.2d 694, 696-97 (Tex. 1986) (Unchallenged findings "are binding on an
appellate court unless the contrary is established as a matter of law, or if there is no evidence to
support the finding.")).

truthfulness of his income reported on his federal income tax returns, but as a result of the evidence presented at trial, the bank accounts, the cash (or lack thereof of cash), and the monies flowing in and out of the country, largely unaccounted for, the court finds that Bart's average monthly gross income exceeds $17,500,00. [Finding of Facts and Conclusions of Law]

The Court further finds that Marlies' ability to provide for her minimum reasonable needs is substantially diminished because of her diagnosed mental disability and due to her duties as the custodian of a young child of the marriage. [Finding of Fact]

## C. Analysis

### 1. Presumption against maintenance

As explained above, when the marriage has lasted 10 years or longer, Family Code Section 8.051(2)(B) allows the trial court to award maintenance to a spouse who lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs. Bart does not challenge the trial court's finding that Marlies lacks the ability to earn sufficient income to provide for her minimum reasonable needs. Nor does he directly challenge the trial court's finding that she lacks sufficient property, including separate property, to provide for her minimum reasonable needs.[5] Instead, Bart contends that the trial court erred by awarding maintenance to Marlies because she did not rebut the statutory presumption against spousal maintenance for two reasons: (1) Marlies did not seek employment or any additional education during the pendency of this divorce, and (2) she did not establish that an exception to the presumption against spousal maintenance applies. *See* Tex. Fam. Code § 8.053.

---

[5] In support of his argument that Marlies did not rebut Section 8.053's presumption against maintenance, Bart asserts that the trial court awarded spousal maintenance to Marlies because it decided Bart was at fault for the divorce and lacked credibility, "despite having awarded Marlies the entirety of the parties' liquid assets and the parties' marital home (debt free) [and] giving her a judgment lien against the remaining assets." In addition, as we will discuss below, Bart argues that Marlies failed to establish that $3,500 was necessary to provide for her minimum reasonable needs.

Once a spouse demonstrates that she lacks the ability to earn sufficient income and that she lacks sufficient property, including separate property, to provide for her minimum reasonable needs, *see id.* § 8.051(2)(B), she must overcome Section 8.053's rebuttable presumption that maintenance is not warranted unless she has exercised diligence in "(1) earning sufficient income to provide for the spouse's minimum reasonable needs," *see id.* § 8.053(a)(1), or "(2) developing the necessary skills to provide for the spouse's minimum reasonable needs during a period of separation and during the time the suit for dissolution of the marriage is pending," *see id.* § 8.053(a)(2). Bart argues that Section 8.053 required Marlies to diligently seek employment or diligently seek additional skills to become self-supporting "during the pendency of the proceedings."

We disagree with Bart's construction of Section 8.053(a)(1). "Unlike [S]ection 8.053(a)(2), [S]ection 8.053(a)(1) does not limit the diligence inquiry to 'the period of separation and . . . the time the suit for dissolution of the marriage is pending.'" *Day v. Day*, 452 S.W.3d 430, 434 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (comparing Tex. Fam. Code § 8.053(a)(1) with § 8.053(a)(2)); *but see Baca v. Baca*, No. 11-15-00147-CV, 2016 WL 4574473, at *5 (Tex. App.—Eastland Aug. 25, 2016, no pet.) (mem. op.) ("It is a rebuttable presumption that spousal maintenance is not warranted under Section 8.051(2)(B) unless, during the parties' separation and the pendency of the divorce proceeding, the spouse who seeks maintenance has exercised diligence in earning sufficient income to provide for her minimum reasonable needs or has exercised diligence in developing the necessary skills to provide for her minimum reasonable needs.").

Courts consider a spouse's eligibility for maintenance at the time of the divorce, not whether the spouse will be able to provide for his or her minimum reasonable needs at some

10

point in the future with additional training or education. *See Slicker v. Slicker*, 464 S.W.3d 850, 863 (Tex. App.—Dallas 2015, no pet.) (citing *Deltuva v. Deltuva*, 113 S.W.3d 882, 888 (Tex. App.—Dallas 2003, no pet.) (affirming that spouse seeking maintenance who obtained real-estate license but needed about one year to get her real-estate business "rolling" lacked ability to earn sufficient income)). In *Slicker*, the court of appeals affirmed the trial court's award of maintenance to a spouse who was sixty-seven years old at time of dissolution of the parties' forty-year marriage. *Id.* The court concluded that the record evidence that the spouse had not been in the workplace since 1974 "and has no specific education or employment skills that would facilitate her job search" supported the trial court's finding that she had exercised diligence in her search but lacked sufficient property and the ability to earn sufficient income to provide for her minimum needs. *Id.* The spouse testified that she had not been able to find a job; she had taken one computer class and planned to take another, and she had sent her resume to one employer and worked for another for a short period of time. In addition to this testimony, the spouse's psychologist testified that the spouse suffered from "low self-esteem, high anxiety, depression," and that she had lost weight due to the divorce proceedings. *Id.*

Similarly here, Marlies testified that she has only a GED and her only further education was going to a community college for a couple of years after she got her GED. After high school, she worked in the hotel industry for a little while and had a job making coffee at a sandwich shop. After she and Bart met in 1997 and married in 1998, the only time she worked outside of the home was in 2010 for about three months when she had a part-time job at a friend's café.[6] She testified that her full-time job was raising the children and being a homemaker. Marlies

---

[6] At that time, she and Bart were separated, and Marlies was living with her parents while Bart stayed in their home with the children.

11

further testified that Bart did not allow her to accept any jobs during the marriage and that he expected her to stay home and take care of him, the children, and the house. She testified that although he would have allowed her to work in the family antiques business, she does not like the type of people that make up his clientele, so she preferred to stay distant from the business. She had no credit card of her own, and Bart controlled when she was allowed to use the credit card or cash for household purchases. Starting in approximately 2015, Bart gave her an allowance of $100 to $200 per week. She had no control over the money in the family bank accounts. At the time of trial, she was continuing to raise the couple's youngest daughter, who was in sixth grade and still living at home.

On appeal, Marlies asserts that she is unable to seek employment or develop employment skills based on the proof she offered at trial of her "incapacitating physical or mental disability." *See* Tex. Fam. Code § 8.051(2)(A); *see also id.* § 8.053(a) (establishing that spouse seeking maintenance is only required to overcome rebuttable presumption against maintenance by showing diligence in earning sufficient income and developing necessary skills to provide for minimum reasonable needs if maintenance is sought under Section 8.051(2)(***B***)); *Sheshtawy v. Sheshtawy*, 150 S.W.3d 772, 777 (Tex. App.—San Antonio 2004, pet. denied) (concluding that "a spouse who is unable to seek employment or develop employment skills due to an incapacitating physical or mental disability can in essence rebut the presumption [against maintenance] with proof of his or her disability").[7] The record evidence established that Marlies has been diagnosed

---

[7] The prior version of Section 8.053 applied the presumption to Section 8.051(2) in its entirety, not solely to a spouse who lacked earning ability, but it excepted from the presumption a spouse who had an incapacitating physical or mental disability or who was the custodian of a child requiring substantial care and personal supervision because of a physical or mental disability. 2005 Tex. Sess. Law Ch. 914, H.B. No. 201, effective Sept. 1, 2005 (approved June 18, 2005) Sec. 8.053(b).

with Bipolar II disorder. Marlies's psychiatrist since October 2015, Dr. Frederic Wilson, testified that Marlies suffers from Bipolar Disorder Type II, which he described as "a lifelong chronic illness, mental health illness characterized by—in her case Bipolar II disorder involves hypomanic episodes and depressive episodes with a return to baseline in between episodes." In 2010, Marlies attempted to commit suicide and subsequently spent several weeks in a psychiatric hospital in Houston. After the psychiatric hospital released her into her parents' care, she lived with them for at least six weeks. Dr. Wilson testified about Marlies's current treatment with a combination of medications to stabilize her mood and regular appointments with him.

When asked what it was like to live with someone "who battles these mood swings," Bart testified that it did not take much to "set her off," resulting in "huge fights" and that she could be "very volatile" and aggressive towards Bart but mainly "was aggressive towards the house, the cars, throwing stuff."[8] He further testified that when Marlies suffers from a depressive episode, she is unable to function for several days, and that when she suffers from a manic episode, she goes into "a rage." However, based on Dr. Wilson's testimony when asked if Marlies is employable that "[b]ipolar disorder does not preclude employment in the majority of cases, so Bipolar II especially [does not]," Bart argues that Marlies's Bipolar II diagnosis does not establish that she has an incapacitating disability that would allow her to effectively rebut the presumption.

Although Marlies did not obtain a finding of fact and did not conclusively establish that she suffers from an incapacitating disability that renders her unable to earn sufficient income,

---

[8] We note that Marlies testified at length about incidents during the marriage when Bart physically abused her, which Bart disputed. The trial court made a finding of fact that "Bart was guilty of cruel treatment of Marlies of a nature that rendered further living together unsupportable" and a conclusion of law that "Marlies has met her burden of proof and should be granted a divorce on the grounds of insupportability and cruel treatment."

*see* Tex. Fam. Code § 8.051(2)(A), we conclude that record evidence supports the trial court's finding of fact that Marlies's "ability to provide for her minimum reasonable needs is *substantially diminished* because of her diagnosed mental disability and due to her duties as the custodian of a young child of the marriage." (Emphasis added.) While this finding of disability that substantially diminishes Marlies's earning ability, standing alone, does not allow her to avoid rebutting the presumption, it and other evidence support the trial court's finding and conclusion that Marlies lacks the ability to earn sufficient income to provide for her reasonable minimum needs, *see id.* § 8.051(2)(B). On this record, keeping in mind that we must review the evidence in the light most favorable to the trial court's finding and conclusion that Marlies is entitled to spousal maintenance, we hold that the trial court could have determined that under these circumstances, Marlies's lack of education and employment experience and skills, combined with her substantially diminished ability to provide for her minimum reasonable needs, overcame the presumption against maintenance.[9] *See Slicker*, 464 S.W.3d at 863 (concluding that evidence of wife's psychological issues, long period of time not working outside home, and lack of specific education or employment skills that would facilitate job search supported finding that wife was eligible to receive maintenance).

---

[9] The appellate record reflects that Marlies testified at a post-judgment hearing on temporary orders that she had accepted a job as a nanny in August 2021 and would be making $13 per hour.

14

**2.      Minimum reasonable needs**

Bart also contends that Marlies did not establish that $3,500 per month is necessary for her minimum reasonable needs.  He argues that because she did not provide a budget or testimony about her projected minimum needs, the spousal-maintenance award should be reversed in its entirety.

The term "minimum reasonable needs" is not defined in the Family Code. Therefore, determining what the "minimum reasonable needs" are for a particular individual is a fact-specific determination which must be made by the trial court on a case-by-case basis. *E.g., Deltuva*, 113 S.W.3d at 888; *Amos v. Amos*, 79 S.W.3d 747, 749 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.) (noting that evidence of minimal reasonable needs included wife's abilities, education, financial concerns, and business opportunities).  "While a list of expenses is helpful, such a list is not the only evidence upon which a trial court can determine a person's 'minimum reasonable needs.'" *Diaz v. Diaz*, 350 S.W.3d 251, 254-55 (Tex. App.—San Antonio 2011, pet. denied) (citing *Trueheart v. Trueheart*, No. 14-02-01256-CV, 2003 WL 22176626, at *2 (Tex. App.—Houston [14th Dist.] Sept. 23, 2003, no pet.) (mem. op.)).

Here, no itemization of Marlies's monthly expenses was in evidence at trial, but the evidence established that she is a 45-year-old housewife with a GED and no job skills who has not been employed outside the home since she and Bart met twenty-four years before the divorce.  She testified that she is not good at math, and there was no evidence she has any marketable skills other than caring for children.  In its findings of fact, the trial court found that Marlies's earning capacity was less than $18,000 per year (i.e., $1,500 per month pretax), and in the decree, it awarded her $1,098.24 per month in child support, for a total of $2,598.24 of possible resources.  The trial court's finding of fact that she has an earning capacity of less than $18,000 per year does not

15

support a conclusion that her minimum reasonable needs have been met. *See Trueheart*, 2003 WL 22176626, at *3 (citing *Matter of Marriage of Hale*, 975 S.W.2d 694, 698 (Tex. App.—Texarkana 1998, no pet.) (explaining that court was unwilling to hold minimum wage is adequate in every case to support individual's or family's minimum reasonable needs)).

The nonliquid assets awarded to Marlies in the decree were the marital residence and an adjacent lot, another piece of real property, two vehicles (one of which needed $5,000 in repairs to be drivable), a riding lawn mower, and a judgment of $400,000 against Bart, secured by an owelty lien on the real properties awarded to him (payable at $2,500 per month at 4% interest for five years at which time the remaining balance is due); the liquid assets awarded to her were bank accounts with balances that totaled $10,682.96 and an annuity with a cash value of $48,942.46.[10] The trial court had before it evidence that the parties had entered into a Rule 11 agreement effective for the pendency of the divorce proceeding that allowed Marlies to continue residing in the marital residence and using the cars in her possession and required Bart to pay all bills for the marital residence, including but not limited to "insurance, property taxes, utilities, cable, and internet, . . . car insurance and the health insurance and the cell phones for the parties and children," as well as the children's extracurricular activities and out-of-pocket expenses and

---

[10] The trial court awarded the $400,000 judgment against Bart in a section of the divorce decree titled "Judgment and Lien to Equalize Division of Property," finding that "because of the nature of the properties making up the estate, the property cannot be divided in a just and right manner without impairing the value of all properties." Having awarded several real properties to Bart, the trial court further found that "it is necessary to impose an encumbrance for owelty of partition against the entirety of those properties described [in the decree] to secure the payment of the judgment resulting from the award." In its findings of facts and conclusions of law, the trial court found that the money judgment "is fair and just to both parties in light of all the evidence presented at trial based upon the award of assets and debts awarded to the parties."

16

$2,200 per month in child support. [11] The agreement also prohibited either party from terminating or affecting the service of water, electricity, gas, telephone, cable television or other contractual services, such as security, pest control, landscaping or yard maintenance at the parties' residence. There was evidence in the record of the estimated property taxes for the marital residence. After the divorce, all these expenses would become Marlies's responsibility. The only exception, other than Bart's cell-phone bill, would be their youngest child's health and dental insurance, which the decree provides that Bart is to obtain and maintain at his sole cost, with the out-of-pocket expenses to be evenly split between him and Marlies.

The trial court also admitted evidence from Marlies of receipts for additional expenses that she had been unable to pay, which included outstanding medical expenses from a 2019 surgery, veterinary expenses, automobile maintenance, gasoline, home maintenance, and clothing expenses, some of which were bills her parents had paid on her behalf. Dr. Wilson, Marlies's psychiatrist, testified regarding her need for ongoing psychiatric care and prescription medications due to her diagnosed Bipolar II disorder. *See Hale*, 975 S.W.2d at 698 (holding that even when generalized list of expenses had been provided that included groceries, household supplies, utilities, car payment, gas, car insurance, school lunches, loan payment, and credit-card payments, trial court could consider "other essential needs that everyone has, such as her portion of health premiums, uncovered medical expenses, drugs and medicines, clothing and the like").

We conclude that Marlies provided some evidence of "a substantive and probative character" to support the trial court's decision that the award of $3,500 per month in spousal

---

[11] At the time of the Rule 11 agreement, their older daughter was a senior in high school and still living at home, but she was no longer under the trial court's jurisdiction by the time the trial court issued its findings of fact and conclusions of law.

maintenance was necessary to provide for her minimum reasonable needs. *See Stamper*, 254 S.W.3d at 542; Tex. Fam. Code § 6.709(a)(1). Conversely, Bart has not established either that there was no evidence to support the trial court's award, *see Zeifman*, 212 S.W.3d at 588, or that the credible evidence supporting the award is so weak, or so contrary to the overwhelming weight of the evidence, that the award should be set aside because it is clearly wrong and manifestly unjust, *see Crosstex*, 505 S.W.3d at 615. After reviewing the evidence presented, we conclude that the trial court had sufficient evidence before it that would allow it to properly determine Marlies's minimum reasonable needs. *See Amos*, 79 S.W.3d at 750. We further conclude that the trial court made a reasonable decision based on the evidence, "that is, that the court's decision was neither arbitrary nor unreasonable." *Zeifman*, 212 S.W.3d at 588; *see also Hale*, 975 S.W.2d at 698 (taking into account wife's "uncertain and very limited earning capacity" among other circumstances when affirming trial court's spousal-maintenance award).

### 3. Amount awarded

Bart also asserts that the maintenance amount awarded of $3,500 per month exceeds the amount allowed by statute. The Family Code limits the amount that a trial court may award to a monthly amount that does not exceed the lesser of $5,000 or 20% of the obligor's average monthly gross income. Tex. Fam. Code § 8.055(a). Bart complains that the trial court's findings of fact and conclusions of law are inconsistent about what the amount of his gross income is and that none of the findings are supported by the evidence.

In its finding of fact and conclusion of law related to spousal maintenance, the trial court stated as follows:

18

> Due to Bart's lack of veracity and lack of truthfulness of his income reported on his federal income tax returns, but as a result of the evidence presented at trial, the bank accounts, the cash (or lack thereof of cash), and the monies flowing in and out of the country, largely unaccounted for, the court finds that Bart's *average monthly gross income* exceeds $17,500.00.

(Emphasis added.) $3,500 is 20% of $17,500. The trial court also found that "Bart's annual earning capacity is in excess of $150,000 per year and . . . that the amount of net income reported by Bart on the parties' income tax returns is not representative of his earning capacity and misreports said income." This finding is not inconsistent with the court's finding that his average monthly gross income exceeds $17,500. If Bart's gross income were $17,500 every month, his earnings would in fact exceed the $150,000 that the trial court found his annual earning capacity should exceed.

Although Bart does not challenge the trial court's award of monthly child support, he points out that in its finding of fact related to child support, the trial court stated that Bart should pay "child support to Marlies at the level described in the Texas Family Code for a gross of $7,500 per month" (i.e., $90,000 per year). In the final decree, the trial court ordered Bart to pay Marlies $1,098.24 per month in child support. However, the trial court did not find that $7,500 per month was Bart's monthly gross income; it merely found that $7,500 should be the level used to determine the monthly child-support payment.[12]

---

[12] We note that the child-support guidelines are based on the monthly net resources of the obligor, not the obligor's gross income. *See* Tex. Fam. Code § 154.125. The trial court's award of $1,098.24 per month would be 20% of $5,491.20 (i.e., $65,894.40 for twelve months). *Id.* § 154.125(b) (establishing that obligor whose monthly net resources are less than statutory cap, which was $9,200 in 2021, presumptively pays 20% of his net resources for one child's support). Neither party complains on appeal about the amount of child support awarded, so we do not address the merits of this award.

Bart further argues that "no non-speculative testimony or evidence establishes Bart's alleged income exceeds his estimated $65,000-$67,000 annual net income" and that the expert Stephen Gonsoulin, a CPA who specializes in business valuations and appraisals, estimated Bart's income to be $67,000 per year. Bart's argument mischaracterizes the record evidence and testimony. Bart did not present any documentary evidence that his income was $65,000-$67,000 per year. Instead, Bart testified that he agreed that the $65,000-$67,000 number provided by Gonsoulin was roughly accurate, and he asked the court to use that as its basis for the child-support and spousal-maintenance awards. However, Gonsoulin did not derive the estimated salary from any evidence that established it as the amount that Bart actually paid himself from the business. Instead, Gonsoulin testified that he looked at a Bureau of Labor Statistics database that provided compensation amounts in 2019 for a category called general and operations managers and another database, Texas MSA Wages. He stated that the compensation could range from $35,000 to the 75th percentile of $100,000, depending on the size of the company, which he factored into his estimate.

We note that the trial court made the following specific findings of fact and conclusions of law related to Bart's lack of veracity and his handling of the business entities' finances:

16. **Lack of Veracity.** The evidence at trial demonstrated Bart's lack of truthfulness with regard to Bart's assertions about his income, his dealings (business or otherwise) in and out of the country, and his cash flow. Bart's actions and inactions during the marriage and at trial caused the Court to find little faith in the veracity of Bart.

17. **Alter Ego.** The business entities known as Lion's Antiques, LLC and The Belgian's Antiques, LLC, are the alter ego of Bart Debrock and in dividing the community estate, the corporate entities of the business entities are to be disregarded. At all times during the existence of Lion's Antiques, LLC, and The

20

Belgian's Antiques, LLC, Bart used his credit cards and bank accounts for both his own personal expenses and for his business expenses to such an extent that due to such commingling he·was unable to separate his personal expenditures from the business expenses. During the marriage Bart was at all times in complete and sole control of The Belgian's Antiques, LLC and The Lion's Antiques, LLC, to the detriment of Marlies Debrock and the community estate. [Finding of Fact and Conclusion of Law]

. . . .

19. **Other Considerations.** The Court finds that due to the actions of Bart and contrary to the orders of the Court, there were numerous wasted or otherwise disposed of assets by Bart at the time of trial, to the detriment of Marlies, which was considered by the Court and part of the basis for the Court's ruling, including the money judgment. The Court finds Bart failed to comply with the Court's orders and failed to timely produce his financial and business records and accounting to Marlies, to the detriment of Marlies. [Finding of Facts and Conclusions of Law]

The trial court had before it some evidence of a substantive and probative character, including Bart's and the businesses' bank records and tax returns that support these findings.[13] In addition, the trial court "is best able to observe the witnesses' demeanor and personalities," *Zeifman*, 212 S.W.3d at 587, and as factfinder, it "is the sole judge of the credibility of witnesses and the weight to be given to their testimony," *Golden Eagle Archery*, 116 S.W.3d at 761.

Based on our review of the evidence presented, we conclude that the trial court had sufficient evidence before it to support its finding that an award of $3,500 per month did not exceed the amount allowed by the statute. *See Zeifman*, 212 S.W.3d at 588. We further conclude that the trial court made a reasonable decision, based on that evidence. *Id.*

---

[13] Section 8.052 requires the court to consider all relevant factors when determining the amount of the payments, including, among others, "acts by either spouse resulting in excessive or abnormal expenditures or destruction, concealment, or fraudulent disposition of community property, joint tenancy, or other property held in common." Tex. Fam. Code § 8.052(6).

Having determined that the trial court did not abuse its discretion by finding that Marlies is entitled to spousal maintenance in the amount of $3,500 per month for a seven-year period, we overrule Bart's first issue.

## II.   The Property Valuation and Characterization and the Division of Debts and Assets

In Bart's four remaining issues, he asserts that the trial court made numerous errors in its property valuation and characterization that require reversal of the court's division of the estate and either remand or reformation of the decree. First, he contends that there is legally and factually insufficient evidence to support the trial court's valuation of business assets and goodwill because the expert Gonsoulin's testimony should have been excluded, but that even if his testimony is admissible, it is insufficient to support the valuations that the trial court used in making its property division and awards. Second, he asserts that the trial court erred in valuing the community debt. Third, he asserts that the alleged errors are significant enough to require reversal and remand or reformation. Fourth, he argues that fifteen of the trial court's findings of fact and conclusions of law are not supported by sufficient evidence, lack relevance to an issue to be decided, or constitute incorrect legal conclusions.

### A.   The Expert Gonsoulin and His Testimony About the Value of the Businesses

#### 1.   The trial court did not err by allowing Gonsoulin to testify.

Bart contends that Gonsoulin's expert testimony should have been excluded, asserting that Marlies untimely disclosed that he would be a testifying expert on December 31, 2020, fourteen days before the trial started, and that Gonsoulin's report and opinion were not received until the morning of trial. *See* Tex. R. Civ. P. 193.5(2) (establishing that amended or

22

supplemental response made less than thirty days before trial is not timely, except as otherwise provided by Texas Rules of Civil Procedure); *see also* Tex. R. Civ. P. 193.6 (establishing that party may not offer testimony of witness who was not timely identified unless trial court finds good cause for failure to timely supplement discovery response or that failure to timely supplement discovery response "will not unfairly surprise or unfairly prejudice the other parties"). Before trial, Bart moved to strike Gonsoulin as an untimely designated expert. After hearing the parties' argument on the motion on the first day of trial, the trial court denied the motion on the record.

The trial court included in its findings of fact and conclusions of law "that Stephen Gonsoulin is the court appointed business appraiser and had not been dismissed by the Court as the business appraiser at the time of trial. [Finding of Facts and Conclusion of Law]." Bart argues that the trial court erred by making this determination, asserting that Gonsoulin could not be both a neutral appraiser and Marlies's testifying expert, citing *In re Harris*, 315 S.W.3d 685, 704 (Tex. App.—Houston [1st Dist.] 2010, no pet.). However, the appellate court in that case was considering whether the trial court had erred by conflating the roles of a special master and a forensic examiner in the context of electronic discovery and by appointing the independent forensic examiner to be a special master with more extensive powers than a forensic examiner. *Id.* at 704-05. In this case, there is record evidence supporting the trial court's finding and conclusion that Gonsoulin had been appointed by the court as the business appraiser, pursuant to the parties' March 20, 2019 Rule 11 agreement, and that the trial court had never dismissed Gonsoulin from his agreed role to appraise the business.

The parties' March 2019 agreement provided that Gonsoulin was appointed "to evaluate the businesses and prepare a valuation of the businesses" and that all costs would be paid by the businesses. The agreement further provided as follows:

23

Bart Debrock shall grant the appraiser access to all records, entry onto the real property, and review of all personal property, as well as turn over all documentation requested by the appraiser to conduct the appraisal. The Court shall determine division of the parties' assets and businesses if not agreed upon by the parties. The parties reserve the right to dispute any testimony the appraiser may have with regard to valuation of the business.

Bart argues that because the parties later agreed on Winston McKenzie as the appraiser for the businesses' inventory, after Gonsoulin had informed them that he needed a full inventory to be taken and the items valued as part of the business appraisal and that he was not the person to do that, Gonsoulin was somehow removed from his role as the court-appointed business appraiser. Instead, the email correspondence attached by Bart to his motion to strike Gonsoulin shows that in April 2019 Bart refused to pay for both Gonsoulin and the inventory appraiser, taking the position that only an inventory valuation was necessary to value the businesses. Accordingly, the parties' September 2019 Rule 11 agreement that Bart would pay McKenzie out of the businesses' income to estimate the inventory reflected both parties' positions:

[Marlies] reserves the right to designate a business appraiser, other and beyond Mr. McKenzie, to conduct a business appraisal and to serve as an expert witness, but such designation shall not entitle [Marlies] to a continuance unless [Bart] refuses to pay for the same, and [Bart] shall be allowed to object to the need and relevance of such a valuation since Respondent maintains there is no business value beyond the inventory and assets (no going concern value).

On November 24, 2020, Marlies moved for a continuance, citing to the March 2019 agreement appointing Gonsoulin as appraiser and stating,

The seriousness of the failure by [Bart] to produce the documents requested is demonstrated by the fact that the expert [Gonsoulin] who has been retained to value The Belgian's Antiques, LLC, and Lion's Antiques, LLC, cannot express an

24

opinion as to the value of those entities without the documents requested herein and without the documents being provided to him in a timely manner before trial.

Marlies requested that the case be continued "to allow her attorneys to receive all necessary documents and to allow a proper valuation of the assets by the business appraiser and time for a property valuation by the business appraiser," arguing that without such a valuation, it would be impossible for the court to determine how to fairly and equitably divide the assets. After the trial court granted Marlies's motion for continuance, the parties entered into a Rule 11 agreement, stating that they would abide by the trial court's December 10, 2020 order and that all discovery would be supplemented by December 31, 2020.

At trial, the parties argued Bart's motion to strike before Gonsoulin was allowed to testify. Marlies's attorney argued that she specifically brought up at the hearing on the November 2020 motion for continuance that Gonsoulin might not have time to review all the records because Marlies's attorney still had not received all the requested documents. Marlies's attorney further argued that she also received Gonsoulin's report for the first time on the morning of trial, due to the delays in receiving documents from Bart.

We conclude that the trial court had sufficient evidence before it to support its finding that Gonsoulin is the court-appointed business appraiser and that he had not been dismissed as the court-appointed business appraiser at the time of trial. Based on that evidence, the trial court made a reasonable decision to allow Gonsoulin to testify at trial. In the alternative, even if Gonsoulin had become Marlies's testifying expert because Bart refused to pay him despite the term in the Rule 11 Agreement requiring all costs to be paid by the businesses, we conclude that the record shows that Marlies carried her burden to establish lack of unfair surprise or prejudice. *Beard Family P'ship v. Commercial Indem. Ins. Co.*, 116 S.W.3d 839, 850 (Tex. App.—Austin

25

2003, no pet.). The record reflects that Marlies's November 2020 motion for continuance was based on Bart's alleged delay in producing documents that the Rule 11 Agreement required him to turn over to Gonsoulin. Accordingly, the trial court had evidence before it that Bart had been put on notice more than 30 days before trial that Marlies intended to use Gonsoulin as an expert, and it also heard argument that Bart's delay in responding to discovery requests was at least partially responsible for Gonsoulin's report not being delivered until the morning of trial. We therefore determine the trial court could have reasonably concluded that Bart was not unfairly surprised or prejudiced by Marlies's allegedly untimely disclosure of Gonsoulin. *See, e.g.*, *High Mountain Ranch Group, LLC v. Niece*, 532 S.W.3d 513, 522 (Tex. App.—Texarkana 2017, no pet.) (citing *Beard*, 116 S.W.3d at 850, and holding trial court did not abuse discretion by impliedly finding party was not unfairly surprised or prejudiced by late disclosure).

### 2. Gonsoulin's testimony is sufficient to support the trial court's valuation of the businesses and its division of the community estate.

Bart argues that even if Gonsoulin's testimony is admissible, it was legally and factually insufficient to support the trial court's valuation of Bart's business and its disproportionate division of the parties' estate. In a divorce decree, "the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." Tex. Fam. Code § 7.001. The trial court has wide discretion in balancing these factors and determining the proper division. *See Murff v. Murff*, 615 S.W.2d 696, 698-99 (Tex. 1981). Community property need not be equally divided, but an unequal division must be equitable and the trial court must have a reasonable basis for the unequal division. *O'Carolan I*, 71 S.W.3d at 532. "To constitute an abuse of discretion, the

26

property division must be manifestly unfair." *Id.* (citing *Mann v. Mann*, 607 S.W.2d 243, 245 (Tex. 1980)).

Trial courts may consider a number of factors when dividing the estate to justify a disproportionate division. *Murff*, 615 S.W.2d at 699 (providing nonexclusive list of factors, including (1) spouses' capacities and abilities; (2) benefits which party not at fault would have derived from marriage's continuation; (3) business opportunities; (4) education; (5) relative physical conditions; (6) relative financial conditions; (7) disparity of ages; (8) size of separate estates; (9) nature of property; and (10) disparity of earning capacities). The court may also, in making a disproportionate division, consider the conduct of the errant spouse, *see, e.g.*, *Chafino v. Chafino*, 228 S.W.3d 467, 473 (Tex. App.—El Paso 2007, no pet.); *Mohindra v. Mohindra*, No. 14-06-00056-CV, 2007 WL 3072057, at *2 (Tex. App.—Houston [14th Dist.] Oct. 23, 2007, no pet.) (mem. op.), and the wasting of community assets, *see, e.g.*, *Schlueter v. Schlueter*, 975 S.W.2d 584, 589 (Tex. 1998). The trial court has the opportunity to observe the parties and other witnesses, determine credibility, and evaluate the parties' needs and potentials. *Murff*, 615 S.W.2d at 700. "Mathematical precision in dividing property in a divorce is usually not possible. Wide latitude and discretion rests in these trial courts and that discretion should only be disturbed in the case of clear abuse." *Id.* The appellant bears the burden "to show from the record that the division was so disproportionate, and thus unfair, that it constitutes an abuse of discretion." *O'Carolan v. Hopper* (*O'Carolan II*), 414 S.W.3d 288, 311 (Tex. App.—Austin 2013, no pet.).

A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision. *Von Hohn v. Von Hohn*, 260 S.W.3d 631, 640-41 (Tex. App.—Tyler 2008, no pet.). Moreover, we should reverse a court's division of property only if the error materially affects the court's just-and-right division of the property. *Id.* at 641.

27

Similarly, errors in the valuation of property do not require reversal unless they render the trial court's property division manifestly unjust. *Id.* (citing *Cook v. Cook*, 679 S.W.2d 581, 585 (Tex. App.—San Antonio 1984, no writ)). If we find reversible error in any part of the trial court's property division that materially affects its just-and-right division of the community estate, we must remand for a new division of the entire community estate. *Delancey v. Delancey*, No. 03-10-00240-CV, 2011 WL 677401, at *7 (Tex. App.—Austin Feb. 24, 2011, no pet.) (mem. op.) (citing *Jacobs v. Jacobs*, 687 S.W.2d 731, 732-33 (Tex. 1985)).

Bart argues that Gonsoulin's valuations of the businesses' inventory values and of goodwill are not supported by sufficient evidence, and therefore, his overall valuation of the businesses is not supported by sufficient evidence. Bart contends that Gonsoulin's valuation of the businesses' inventory, which was based on McKenzie's valuation of the businesses' inventory, is higher than it should be, arguing that McKenzie based his inventory values on what Bart states is the incorrect assumption that Bart was a wholesaler, not a sourcer. Bart further argues that McKenzie acknowledged that if Bart were a sourcer, those values should be approximately 30% lower. Although Bart testified that he was a sourcer, not a wholesaler, McKenzie testified to how he defined "wholesaler" and determined that was what Bart's role was, and it was within the trial court's discretion to conclude that both McKenzie's assumption and resulting inventory values were correct. *See id.* ("[T]he court of appeals may not . . . substitute its judgment for that of the [fact finder], even if the evidence would clearly support a different result." (quoting *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998)).

Bart also makes multiple complaints about the trial court's valuation of the businesses' goodwill. Goodwill has been defined as "the advantages that accrue to a business on account of its name, location, reputation and success," and the fact that the business's goodwill

28

was created by or resulted from years of hard work and business effort on the part of only one owner does not necessarily render the business's goodwill personal to that owner. *Taormina v. Culicchia*, 355 S.W.2d 569, 574 (Tex. Civ. App.—El Paso 1962, writ ref'd n.r.e.). "The value of the 'good will' of a business depends upon the fixed and favorable consideration of customers arising from an established and well-known and well-conducted business." *Id.* The question of whether goodwill exists and its valuation are questions for the factfinder. *See id.* at 575; *see also Finn v. Finn*, 658 S.W.2d 735, 741-742 (Tex. App.—Dallas 1983, writ ref'd n.r.e.).

In Gonsoulin's report admitted into evidence at trial, Gonsoulin concluded that $1,352,000 was the market value for the entire company, excluding Bart's personal goodwill of $161,000, which he valued at 50% of the overall goodwill, which was $322,000. Bart asserts that Gonsoulin later "changed that total goodwill number to $500,000, but conceded that at least 75% of that goodwill amount was personal goodwill rather than 50%." He further argues that although the trial court's judgment and findings relied on correct real-estate values rather than the incorrect ones that Gonsoulin had relied upon, the trial court did not reduce the "commercial goodwill" amount from $161,000 to $125,000, which would be the amount of commercial goodwill if the trial court agreed that the total value was $500,000 and commercial goodwill was 25% of the value.[14]

---

[14] Relying on cases holding that "bare, baseless opinions will not support a judgment even if there is no objection to their admission in evidence," Bart argues that Gonsoulin's testimony lacks a reliable foundation. *See, e.g.*, *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009). As an example of what he asserts is the flawed, conclusory foundation of Gonsoulin's opinions, Bart asserts that Gonsoulin relied on incorrect values provided to him by Marlies's counsel instead of using the current appraisal district values for some of the DeWitt County properties the businesses own. *See Rogers v. Zanetti*, 518 S.W.3d 394, 406 (Tex. 2017) (holding that "relaying the opinion of another witness without providing any basis for the borrowed conclusion is itself no evidence"). However, Bart fails to provide adequate record references for this Court to compare the alleged difference in values and later states "the trial court's judgment

The trial court heard varying testimony from Gonsoulin on what the goodwill amount would be, depending on various factors. Gonsoulin testified that his initial number of $322,000 understated goodwill if the marital residence and adjoining lot should be taken out of the business assets because they did not have any business function but were deeded to one of the LLCs. Gonsoulin testified that this is because he incorporates rent into his adjusted profit-and-loss amount, so a reduction in rent would lower the profit and loss and thus understate goodwill. He also testified that goodwill would increase if the lower appraisal values were used for the DeWitt County properties. Gonsoulin testified that taking out the marital residence would change the 50% of goodwill to $230,000, while also changing the DeWitt County property values would change the 50% of goodwill to $250,000.

Gonsoulin testified that he analyzed the following factors when determining what percentage of the goodwill was personal versus commercial: linkage of company name to owner name; whether competitive pricing and service is a key customer consideration; duration, location, and telephone number; nature of business; size of workforce and existence of competent employees who handle day-to-day customer needs; role of company principal to existing customers; critical specialized knowledge of the business by the owner; recruitment of new customers by owner; whether customers contract with business or owner; owner's role in management; company principal's ability to re-enter market as competitor; and marketability of

---

and findings accepted that Gonsoulin's real estate values were wrong." Bart has not demonstrated that all of Gonsoulin's testimony lacks a reliable foundation by arguing that the trial court reached a different conclusion about the property values than Gonsoulin did. As discussed in detail below, the trial court heard extensive testimony from Gonsoulin about the information he analyzed and the factors that he considered to reach his conclusions about the goodwill valuation. Bart has not shown that Gonsoulin's testimony is so conclusory or speculative that it cannot support a judgment.

the company. Gonsoulin qualified his goodwill valuation by noting "there's considerable subjectivity in an analysis like this" and that he had to make judgment calls on many of the factors based on his experience and knowledge of the business. He also acknowledged that he would have been able to more accurately assess those factors if he had been able to talk to Bart before completing his analysis. Bart's counsel asked Gonsoulin whether he would potentially change the way he weighted those factors if counsel represented to him that Bart had testified, for example, that Bart is the sole employee in the organization that existing customers had contact with, he is the only one who recruits new customers, and that customers contract only with him. Bart's counsel asked Gonsoulin what the percentage of personal goodwill would be compared to commercial goodwill if, based on this assumption about Bart's testimony, he changed these three factors to 100% personal. Gonsoulin recalculated his numbers based on that hypothetical question and testified that based on those assumptions, he thought 75% personal goodwill would be reasonable, which using his revised total goodwill number of $500,000 would mean that $375,000 of goodwill would be personal and $125,000 would be commercial and thus community property. To the extent that Bart's counsel asked Gonsoulin to revise his numbers based on Bart's testimony, the court as factfinder can decide what weight to give Bart's testimony and whether to accept Gonsoulin's revised numbers. *See Delancey*, 2011 WL 677401 at *7 ("The court of appeals is not a fact finder. Accordingly, the court of appeals may not pass upon the witnesses' credibility or substitute its judgment for that of the [factfinder], even if the evidence would clearly support a different result." (quoting *Maritime Overseas Corp.*, 971 S.W.2d at 407)). The trial court had sufficient evidence to conclude that the total amount of goodwill was $322,000 and that the amount of commercial goodwill was 50% of that amount (i.e., $161,000). On this record, we cannot conclude that its decision was arbitrary or unreasonable.

31

Bart also asserts that the trial court erroneously treated both $161,000 in "commercial goodwill" and $161,000 in "personal goodwill" as divisible community property awarded to Bart even though "personal goodwill" is separate property. In its findings of facts and conclusions of law, the trial court included a "valuation of known assets," listing various assets and debts of "the known community estate and their values on hand at trial." Bart argues that because the trial court included $161,000 in personal goodwill and identified it as "awarded to Bart," the trial court must have erroneously included this separate property in the community estate when making its disproportionate division. He argues that this represents a more than de minimis characterization error and that accordingly we must reverse and remand for a new just-and-right division. Bart asserts that "[t]he errors in goodwill calculations and allocation of $322,000 alone represent 31% of what the trial court divided."

As an initial matter, because we have concluded that the trial court did not err by determining that the total amount of goodwill was $322,000 and that 50% of that amount is commercial goodwill, Bart overestimates the percentage of the community estate that a mischaracterization of personal goodwill would represent, even using the limited list of the "known assets," provided by the trial court. This Court's ability to precisely calculate the amount of the community estate is hampered by the fact that the trial court was unable to precisely state its disproportionate division and instead could only value "known assets," due to Bart's actions.[15] In addition, in the trial court's finding of fact and conclusion of law related to the disproportionate division of the community estate, the trial court stated as follows:

---

[15] As explained above, the trial court made a finding of fact that "Bart failed to comply with the Court's orders and failed to timely produce his financial and business records and accounting to Marlies, to the detriment of Marlies."

The evidence at trial demonstrated multiple factors that justify a disproportionate division of the community estate in favor of Marlies, including the following: fault in the breakup of the marriage; fraud on the community; benefits the innocent spouse may have derived from the continuation of the marriage; disparity in earning capacity of the spouses and their ability to support themselves; the spouse to whom conservatorship of the child is granted; the education and future employability of the spouses; earning power, business opportunities, capacities, and abilities of the spouses; nature of the property involved in the division; wasting of community assets by Bart; community funds used to purchase out-of-state or out-of-country property; attorney's fees to be paid; actual fraud committed by Bart; and, constructive fraud committed by Bart. [Findings of Fact and Conclusions of Law]

Although Bart complains in his fifth issue that the evidence is insufficient to support finding that he committed actual or constructive fraud on the community or wasted community funds, we disagree. Among other things, the trial court had before it evidence of unaccounted-for cash flow, large amounts of cash being transported in and out of the country, underreported income to the IRS, and a lack of company documents provided by Bart to adequately document the companies' accounting.[16] The trial court did not abuse its discretion by making these findings and reaching these conclusions. Accordingly, we disagree with Bart that the record demonstrates that the trial court necessarily included the personal goodwill in the community estate. On this record, we cannot conclude that the trial court included the personal goodwill in its calculation of the amount of the community estate, or that if it did so, the error would have been more than de minimis. We overrule Bart's second issue.

---

[16] The evidence presented to the trial court included many years of bank statements from Bart's various bank accounts and his 2015-2019 tax returns.

## B.    The Trial Court's Valuation of the Community Debt

In Bart's third issue, he asserts that the trial court erred by retroactively creating "community" debt and ordering it paid by Bart to a nonparty. In its findings of fact and conclusions of law, the trial court included the following:

> 22. **Award of Attorney's Fees and Other Community Property Debts.** The Court finds that Marlies' attorneys' fees and costs were both reasonable and necessary as incurred by Marlies in this lawsuit, that Marlies had no access to community property funds other than the funds paid to her for child support and for certain debts, and that Bart should be responsible for the payment of Marlies' attorneys' fees and costs. Additionally, due to Bart's actions in this case, the Court finds that awarding attorney's fees to Marlies is just and equitable. The Court finds that community property monies that Marlies had no access to were spent by Bart on Bart's attorneys' fees and costs and that Bart should be responsible for the payment of Bart's attorney's fees. The Court finds that other debts were community property and awarded to Bart as being fair and just in light of the evidence presented at trial, the actions by Bart, and the earning capacity of Bart. [Finding of Facts and Conclusions of Law]

In Bart's fourth issue, he challenges the trial court's finding that Marlies had no access to community property other than the funds paid to her for child support and certain debts, arguing that she "chose not to work" and that she did not attempt to increase her education and marketability. For the reasons explained in the spousal-maintenance section, we conclude that the trial court had sufficient evidence before it to find that Marlies's access to community-property funds was limited to the funds Bart paid to her pursuant to the temporary orders.[17]

---

[17] In his third issue, Bart includes the trial court's order that he pay Marlies's attorneys' fees in the amount of $70,000 in the list of challenged debts, but he makes no direct argument about why this award was improper or improperly valued. We note that Family Code Section 106.002 authorizes a trial court in a suit affecting the parent-child relationship to "render judgment for reasonable attorney's fees and expenses and order the judgment and postjudgment interest to be paid directly to an attorney," and provides that "[a] judgment for attorney's fees and expenses may be enforced in the attorney's name by any means available for the enforcement of a judgment

Bart lists all the debts that the trial court awarded to him in the decree, but he only expressly argues that the trial court ordered him to pay to Marlies's parents "ambiguous amounts that are not debts and/or are duplicative of other awards" and that the trial court failed to credit him for amounts that he undisputedly had already paid to various people. Within the $20,000 debt to Marlies's parents that the trial court ordered him to pay, Bart focuses on the $6,000 in expenses for which Marlies provided receipts at trial and testified that her parents had paid on her behalf while the divorce was pending. Bart argues that there was no loan agreement between Marlies or him and her parents that these amounts would be paid back, and thus this amount was not a community debt. He further argues that the only statutory authority for ordering payment to a nonparty for support of a spouse is Family Code Section 2.501(b), which provides that "[a] spouse who fails to discharge the duty of support is liable to any person who provides necessaries to the spouse to whom support is owed." He argues that these amounts were not for "necessaries," but we disagree. The Texas Supreme Court has held that "a spouse's necessaries are things like food, clothing, and habitation." *Tedder v. Gardner Aldrich, LLP*, 421 S.W.3d 651, 656 (Tex. 2013). The trial court had evidence before it that most of the receipts were for medical expenses, items related to household maintenance, auto maintenance, food, or clothing. We conclude that the trial court did not err by assigning this debt to Bart as part of its just-and-right division of the estate. We overrule Bart's third issue.

---

for debt." Tex. Fam. Code § 106.002. Bart does not challenge whether the attorneys' fees were necessary, and accordingly, we conclude that the trial court appropriately rendered judgment against Bart for those fees.

C.    **No Error Requiring Reversal and Remand**

In his fourth issue, Bart contends that the trial court's characterization and valuation errors related to goodwill, the inventory valuation, and erroneously calculated "community debt" have resulted in more than a de minimis effect on the just-and-right property division that requires us to reverse and remand for a new property division. For the reasons explained above, we disagree that the trial court has mischaracterized or misvalued the challenged parts of the estate. But even if the trial court had erred, as we have previously concluded, on this record we cannot conclude that those errors would be more than de minimis. We overrule Bart's fourth issue.

D.    **The Trial Court's Findings of Fact and Conclusions of Law Related to Bart's Lack of Veracity, Fraud on the Community, and Failure to Comply With Court Orders**

In his fifth issue, Bart complains of fifteen findings of fact and conclusions of law, asserting that they (1) are not supported by legally or factually sufficient evidence, (2) lack relevance to an issue to be decided, or (3) constitute incorrect legal conclusions. We have addressed many of the fifteen findings and conclusions in our discussion of Bart's other issues and have concluded that they are relevant, supported by sufficient evidence, and are correct legal conclusions. The eight that we have not addressed include the following:

> 23. **Fiduciary Duties Spouses Owe to Each Other.** Well-settled Texas law provides that spouses owe each other a fiduciary duty by virtue of their marital relationship. The fiduciary obligation of a spouse imposes a duty to exercise good faith and candor to disclose all relevant information and to refrain from using their relationship to benefit the fiduciary's personal interest to the detriment of the other spouse. This fiduciary duty required of Bart good faith, fair dealing, full disclosure and utmost loyalty. [Conclusion of Law]
>
> 24. **Special Confidence.** Because of their fiduciary relationship, Marlies held a special confidence in Bart, and he had a duty in equity and good conscience to act

36

in good faith and with due regard for Marlies' interests, including her interests in their marital estate. [Conclusion of Law]

25. **Bart Had the Burden to Prove His Actions Were Fair.**  With respect to all transactions under or subject to his management and/or control, this duty also puts the burden of proof on Bart to prove that his actions herein alleged were fair to Marlies and not a breach of his fiduciary duty.  Bart failed to meet that burden. [Conclusion of Law]

26. **Bart Has Breached His Fiduciary Duty.**  Bart has constructively defrauded Marlies by breaching legal, spousal and equitable duties that he owed to her as a result of the fiduciary relationship he and Marlies had with respect to each other. Bart's breach of his fiduciary duty is constructively fraudulent because, irrespective of his moral guilt, such breaches had a tendency to deceive Marlies, violated her confidence, and to injure the public interest.  [Conclusion of Law]

27. **Proximate Causation.**  Bart's conduct and actions in constructively defrauding Marlies proximately caused injury, loss, and/or damage to Marlies and the community estate.  [Conclusion of Law]

28. **Estoppel by Fraud and Breach of Fiduciary Duty.**  Bart should not be allowed by this Court to take or retain any advantage that he created by breaching these obligations.  [Conclusion of Law]

29. **Bart Should Not Be Allowed to Profit from His Constructive Fraud.**  Bart's actions should legally and equitably prevent him from using his deceitful and fraudulent conduct as a means to oppress Marlies, defeat her legal rights to community property entities established during the marriage, and to defraud the community estate.  [Conclusion of Law]

30. **Estoppel by Constructively Fraudulent Conduct.**  Under the law of fiduciaries, Bart was required to fully disclose to Marlies all actions and steps taken by him with respect to the establishment of business entities during the marriage and the effect such actions could have on the community estate of the parties.  He failed to do so and accordingly, Bart should be estopped from benefitting from such fraudulent conduct.  [Conclusion of Law]

Bart asserts that the trial court lacked evidence of any transfer of a community asset and that the burden was on Marlies to establish that there were transfers of community property. *See In re Marriage of Notash*, 118 S.W.3d 868, 873 (Tex. App.—Texarkana 2003, no pet.).  While it is true that "it is the burden of the complaining spouse to show that there was a transfer of community

property in the first place," once a transfer is shown, "the burden of proof to show the fairness of a transfer is upon the spouse responsible for the transfer." *See id.* (quoting *In re Marriage of DeVine*, 869 S.W.2d 415, 423 n. 11 (Tex. App.—Amarillo 1993, writ denied)). As stated above when discussing other related trial-court findings and conclusions, our review of the record shows that the trial court had before it sufficient evidence to support its findings about Bart's management of the companies' finances and community property, and it was not unreasonable or arbitrary for the trial court to reach these conclusions. Although Bart argues that none of these findings are pertinent to the issues raised by him on appeal, we disagree. The trial court could consider both fraud on the community and the breach of fiduciary duty (which, in the context of a divorce, is the same as a claim for fraud on the community) when making a disproportionate division of the community estate. *See id.* at 871, 872 ("[F]raud on the community is properly considered when dividing a community estate" because a disproportionate division provided an adequate remedy for such fraud.). We overrule Bart's fifth issue.

## CONCLUSION

Having overruled Bart's issues, we affirm the divorce decree.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: December 28, 2022